[No. 3097.]

SAM. LANE *v.* THE STATE.

1. MALICIOUS MISCHIEF—INFORMATION.—See the statement of the case for a complaint *held* sufficient to charge the offense of wilfully killing a horse with intent to injure the owner; wherefore a motion to quash the same was properly overruled.

2. PRACTICE—CONTINUANCE—DILIGENCE.—Not only must an application for a continuance show the materiality of the absent testimony, in order to be sufficient, but it must show the exercise of due diligence to secure it on the trial.   The continuance in this case was properly refused.

3. SAME—CHARGE OF THE COURT—INTENT—PRESUMPTIONS.—Upon the question of intent, the court charged as follows:   "The intent to injure the owner is the gist of this offense, but such intent may be presumed from the fact of the killing."   Again: "If you find that defendant killed the horse mentioned in the complaint, you may, from that fact, presume that such killing was done with intent to injure the owner, if, from all the facts and circumstances of the case, it is, in your judgment, proper for you to do so."   *Held*, correct, in view of the provision in Article 679 of

the Revised Penal Code, which has, with reference to this offense, changed and reversed the previous rule on the subject, and authorized the presumption of intent from the perpetration of the act. See the opinion *in extenso* on the subject.

4. SAME—CONSTRUCTION OF A TERM—EVIDENCE.—When used in a penal statute, the word "wilful" means more than it does in common parlance. It means with "evil intent," or "legal malice," or "without reasonable ground for believing the act to be lawful." In common parlance it is used in the sense of intentional, as distinguished from an accidental or involuntary act. In order, then, to have made the killing of the horse wilful, it must have been committed with evil intent, with legal malice, and without legal justification. See the statement of the case for evidence *held* insufficient to disclose an evil intent on the part of the defendant.

APPEAL from the District Court of Llano. Tried below before the Hon. J. C. Townes.

The conviction of the appellant was for the wilful killing of a horse, the property of one J. A. Swanson. The first head note of this report relates to the sufficiency of the complaint. That instrument reads as follows:

"In the name and by the authority of the State of Texas:

"Before me, the undersigned authority, this day personally appeared J. A. Swanson, a credible citizen of Llano county, who, after first being by me duly sworn, upon oath, says that, upon information and belief, that one Sam. Lane, in the county of Llano and State of Texas, and on or about the sixth day of April, 1882, did then and there, wilfully and knowingly kill one animal of the horse species, of the value of fifty dollars, the property of affiant, with intent upon the part of him, the said Sam. Lane, to injure the owner thereof, against the peace and dignity of the State.

"J. A. SWANSON.

"Sworn to and subscribed before me this the eighth day of April, 1882.

"J. S. ATCHISON, J. P.,
"Precinct No. 1, Llano Co., Texas."

A fine of ten dollars was the punishment imposed.

William Rawls, the first witness for the State, testified that he was in the employ of the defendant in April, 1882, and was living at his house at the time that he is charged to have killed

the horse. Some time between midnight and day, on the night the horse was killed, the witness was awakened by horses running around the house. A few minutes later, the witness heard the report of a gun. Presently the defendant came into the house and said that he had shot that horse; that he was sorry, but that he had to shoot him.

On cross-examination, the witness said that the horse shot by defendant was an iron gray stallion, about two years old. The horse had been in the neighborhood, when shot, some five or six days. Witness did not know to whom he belonged. He had been annoying and injuring defendant's mares before that night. He had been particularly troublesome to a certain mare with a young colt, that belonged to the defendant, and the defendant had made many inquiries as to who owned him. The witness did not know how long the horses had been running on the night of the shooting. He was awakened by the noise they made running around the house. The defendant came into the house after the shooting, and said that he had shot the stud; that he was sorry he had to do it, but that he could not help it, as the stud was running his mare and colt; that he had ineffectually tried to catch him, or to run him away. He said that he had to kill the stud to save his own property, as he was certain, if he did not, that the stud would kill his colt. The defendant was a poor man, owning but two mares and colts, one of the colts being but a few weeks old. It was this colt and its mother that the stud persistently ran. The defendant plowed this mare all day on the day preceding the night of the shooting. She was so lame on the day after the shooting that she was unable to work. Defendant owned no work animals other than the two mares. This mare, the mother of the young colt, was bruised up and stiff on the morning after the shooting. She had a fresh cut on her hind leg, which looked like it had been inflicted by the hoof of a horse. The colt was also bruised and stiff on the morning after the shooting. Neither the mare nor the colt was hurt, bruised or stiff, but were perfectly sound, when turned out on the evening before. The defendant had no pasture, and always turned his stock outside to graze at night.

Re-examined, the witness stated that he was a witness on the trial of this case in the justice's court. He left Llano county shortly after that trial, and was brought back, under attachment, to testify as a State's witness on this trial.

J. A. Swanson, the next witness for the State, testified tha*t*

on or about the eighth day of April, 1882, he heard of the killing of one of his horses, and went to look for him. He found the dead body of the horse about two hundred and fifty yards from the defendant's house. The horse had a hole in his side, which the witness took to be a gunshot hole. He saw where the horse had been dragged on the ground, and he and his brother, who was with him, followed this trail back to a point about forty or fifty yards from defendant's house, where blood on the ground showed that the horse had died. The defendant came up to the body of the horse, where the witness and his brother were, and witness asked him what he was going to do about the killing of the horse. Defendant replied that he was going to do nothing. The witness was of the opinion that the defendant did not deny that he killed the horse, but would give the witness no satisfaction about it.

The horse killed was an iron gray stud, two years old, the property of the witness, and was worth fifty dollars. He ran with the witness's horses, and had never been troublesome, but, on the contrary, was gentle. A short time before he was killed, the witness had him thrown down for the purpose of castration, but found that he had not dropped his stones, for which reason witness postponed castration. A short time after this, witness missed him from his range and bunch of horses, and saw no more of him until he found him dead, four or five days later. Witness, on one occasion, saw this stud in a field with Brown May's mare, but he took no notice of the proximity of the mare. This horse had never been vicious. Witness and defendant lived two miles apart, and witness's land ran behind that of defendant.

Cross-examined, the witness stated that his brother, William Swanson, was with him when he found the dead body of his horse. The defendant did not deny the killing of the horse, and, when asked what he intended doing about it, merely replied: "Nothing." Witness had no intimate acquaintance with defendant, but had seen him several times, and knew him when he saw him. He had never had any business transactions with defendant; had had no hard or ill feelings toward him, and knew of no hard or ill feelings against himself entertained by the defendant. If defendant had such feelings, he had no just cause for them. Their incidental relations had always been pleasant and friendly. Witness did not know the character or disposition of the horse when off his accustomed range, or away from his usual

bunch of horses. He was off his accustomed range a short dis-
tance when killed. The State closed.

Mrs. David Thompson testified, for the defense, that she knew
defendant, and lived within a quarter of a mile of him at the
time of the killing of the Swanson horse. On the night of the
killing, witness heard a gun fire, and presently heard horses
running by her house, as though something or somebody was
after them.

W. T. Swanson testified, for the defense, that he was a brother
of J. A. Swanson, the owner of the horse that was killed. He
had but little acquaintance with the defendant, and had never
had a business transaction with him. He had never had a diffi-
culty with the defendant; no hard feelings had ever existed be-
tween them, and he knew of no difficulty or hard feelings
between defendant and J. A. Swanson. Witness was with his
brother when the dead body of the horse was found, and with
his brother he followed the drag or trail to where the horse died.
The defendant denied that he killed the horse.

William Casey testified, for the defense, that the reputation
of the defendant in the community where he lived was that of
a good, hard working, industrious, law abiding man. Witness
remembered no one but himself who had discussed these charac-
teristics of the defendant, and he had done so only since the in-
stitution of this prosecution.

The motion for new trial raised the questions discussed in the
opinion.

No brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This prosecution, which was for
the malicious killing of a horse, under provisions of Article 679
of the Penal Code, was originally commenced in a justice's
court, and from thence appealed to the county court, where a
second conviction was had, from which this appeal is taken. A
motion was made to quash the complaint, but in our opinion it
sufficiently charges the offense, and the court did not err in
overruling the motion.

An application for continuance made by defendant and over-
ruled by the court was, upon exceptions saved at the time,
claimed to be erroneous, and is also assigned as error. Consid-

ered in the light of the evidence adduced on the trial, the evidence sought from the absent witnesses was perhaps material, but no sufficient diligence to obtain the testimony is disclosed in the application.

Amongst other things, the court charged the jury that "the intent to injure the owner is the gist of this offense, but such intent may be presumed from the fact of killing." And again: "If you find that defendant killed the horse mentioned in the complaint, you may from that fact presume that such killing was done with intent to injure the owner, if from all the facts and circumstances of the case it is in your judgment proper for you to do so."

Under the law as it formerly was, the intent to injure could not be presumed from the mere fact of killing. (*Newton* v. *The State*, 3 Texas Ct. App., 245.) Since that decision, however, the law has been changed in that regard, and it is now expressly provided in the statute (Penal Code, Art. 679) which defines the offense that in prosecutions under this Article the intent to injure may be presumed from the perpetration of the act." This provision annexed to the statute, we think, makes it obvious that the Legislature intended to make the presumption of intention dependent upon and inferable alone from the proof of the perpetration of the act, and doubtless, also, further intended to make this offense an exception to the general rule with regard to presumptions of law from acts done, in so far as the same are permitted to be given in charge by the court to the jury. (*Jones* v. *The State*, 13 Texas Ct. App., 1.) We do not think the court erred in the charges we have quoted above.

As before stated, this prosecution is for "wilfully" killing the horse, and is brought under Article 679, which statute is essentially different from Article 680, under which the cases of *Davis* v. *The State*, 12 Texas Court of Appeals, 11, and *Thomas* v. *The State*, 14 Texas Court of Appeals, 200, were prosecuted. In those cases the prosecutions were for "wantonly" killing the animals alleged to have been killed.

A mature consideration of the facts in this case has, however, led us to the conclusion that the evidence does not sustain the conviction. According to our reading and understanding of it, appellant killed the horse, which was a vicious animal, because, as was stated by the witness for the State, he was compelled to do so to protect his own property. He also stated at the time that he was sorry that he had to do it. Was this a "wilful"

L

killing in contemplation of law? In *Thomas* v. *The State*, 14 Texas Court of Appeals, 200, it is said: "When used in a penal statute, the word 'wilful' means more than it does in common parlance. It means with *evil intent*, or legal malice, or without reasonable ground for believing the act to be lawful (citing authorities). In common parlance, it is used in the sense of *intentional*, as distinguished from accidental or involuntary. To make the killing of the sheep, therefore, a *wilful* act, it must have been committed with an *evil intent*, with legal malice, and without legal justification."

We do not believe the evidence, as exhibited in the record before us, sufficiently shows such evil intent as would make the killing a wilful one in contemplation of law, wherefore the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered May 14, 1884.